## UNITED STATES v. FRANCIS.

### No. 7010.

Circuit Court of Appeals. Ninth Circuit.

April 24, 1933.

Wellington D. Rankin, U. S. Atty., and D. L. Egnew and Sam D. Goza, Jr., Asst. U. S. Attys., and D. D. Evans, Chief Atty., U. S. Veterans' Administration, all of Helena, Mont.

Philip Savaresy and George S. Smith, both of Billings, Mont., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

WILBUR, Circuit Judge.

Carl R. Francis brought this action to recover upon a war risk insurance policy which lapsed May 1, 1919, upon the ground that before the policy lapsed he had become permanently and totally disabled. He was wounded in battle on May 10, 1918, by a piece of shrapnel which entered the front of his body and was removed from his back on August 10, 1918. During the interim he was in various military hospitals and subjected to numerous operations; pus conditions having developed in the wound. After his discharge he worked for some time before being given vocational training. Having sufficiently qualified himself as a cook, he was employed for some years at various times as a chef and cook. It is claimed by the veteran that, notwithstanding his long periods of work and substantial remuneration therefor, aggregating in all about $15,000, he was "totally and permanently disabled" during that whole period, within the meaning of that phrase as defined by the Treasury Department regulations and by the decisions of the courts. This view was sustained by the jury under proper instructions from the court, and the question is whether or not the court erred in denying the motion of the government for directed verdict.

The testimony in favor of the veteran on the trial was directed to the proposition that, although he did in fact work, and although he did so continuously for long periods of time, he was unable to do so because he thereby imperiled his health and shortened his life by reason of the excessive load put upon his heart, whose functions had been seriously impaired by the wound and resulting pus infection. It was on this basis that the physicians who testified on his behalf expressed the opinion that from and after the infliction of the wound he was at all times totally and permanently disabled. The veteran testified that,

although his physicians advised him that he should not work because it imperiled his life and health to do so, he did not act upon this advice for the reason that it was necessary for him to work in order to support himself and family, regardless of the effect upon his health. Dr. Arnold, who testified on behalf of the veteran, first examined him in 1921 and had charge of his case until 1926. He testified that at the time of his consultations in 1921 the appellee was suffering, among other things, from "chronic myocarditis; enlargement of heart; chronic nephritis; chronic respiratory infection; neurosis and extreme mental despondency; shortness of breath; pulse 120, 140 on exertion, low specific gravity urine; rales in chest. Casts and albumen in urine. Chronic cough, temperature from 100 to 103; weakness and inability to do his work." He also testified that at all times thereafter his mental and physical condition grew worse; that in his opinion his physical condition was due to the wound and shock he had received during the war, together with exposure and extreme fatigue; that the veteran was permanently and totally disabled at all times from and after the infliction of the wound; that the work he did had a tendency to impair his health; that he was in no fit condition to work at all because of his poor physical condition; that he advised him not to work if he could possibly avoid it; that his work made his condition worse, and that the veteran's "heart, kidney and chest condition was such that he might have died while at work."

Dr. Hanley, who testified for the veteran, first examined him in 1926. He testified that the veteran's pulse was very fast and not strong; that his heart sounds were weak; that he was generally in a run-down condition and emaciated; that in his opinion the condition resulted from the chest wound, and was permanent and total from and after the infliction of the injury. He testified: "I know that Mr. Francis has worked during this period. I advised him not to do any work that would require any physical effort. * * * I figure that his work hasn't helped his physical and mental condition any." He based his opinion partly upon the rapid pulse of the veteran, which he found never to run less than 100, and from 100 to 120, whereas the normal pulse was 72, which imposed a burden upon the heart, which tires it out. He stated: "I base my conclusions that the work he has done in the past twelve years has shortened his life and impaired his health because of the extra exertion on the heart. He has a bad heart to start with, you see; he had a bad

heart in 1926 and still has. It is practically the same now. You take a heart of that particular type and it is likely to quit at any time. Any exertion is likely to affect that heart. It is the strain on the heart."

Dr. Treacy, testifying for the veteran, found at the time of trial a rapid pulse of 105 and low blood pressure of 95. Upon his own examination of the veteran and the testimony adduced by the veteran before the court, he expressed the opinion that the veteran was totally and permanently disabled "within the definition of the Treasury Department," and was of the opinion that this total and permanent disability dated back to infliction of the wound. The physician was of opinion that the heart condition was the result of the pus condition which developed in the wound, and that the heart and kidney conditions required complete rest, and stated, "If he doesn't get rest he is lost," that his work has been harmful to him, and that he has probably worked on his nerve.

These three physicians testified in effect that from and after the injury received by the veteran he was unable to work "without seriously impairing his health," and that the work he did impaired his health and would shorten his life. With reference to his ability to work during the periods that he did work, the veteran testified that he suffered spells of sickness while at work, consisting of faintness, pains under his heart, and a "catch" in his neck which made him stop work for from five minutes to half an hour, sometimes several times a day for weeks at a time, and sometimes he had no spells for days or weeks. There was other evidence tending to corroborate the testimony of the veteran as to his physical difficulties while working. The question for our consideration is whether or not this evidence is sufficiently substantial to go to the jury on the question of total and permanent disability during the life of the policy. The opinions of the medical witnesses called by the veteran are based, in the main, upon the condition of the veteran at the time of their examinations in 1921 to 1931 and upon his wound and the effects thereof as stated to or observed by them.

The medical witnesses called by the government not only disagree with the opinions of veteran's witnesses as to the extent of his disability, but also contradict the facts upon which the veteran's witnesses base their opinions. Dr. Fostin examined appellee on March 3, 1926, and testified: "There was no heart condition in 1926. That the heart beat was regular, no murmurs; blood pressure

112-78"; that he "found his heart as normal as any other man's heart." Dr. Allard examined the veteran in 1924 and made an exhaustive report on his condition. He found no heart conditions, and nothing else which would prevent the veteran from following the occupation of cook. Dr. Watters, on June 23, 1927, found no disease of the heart. He found a normal blood pressure, 120–84, and a slight increase of pulse. Dr. Wernham, who examined the veteran January 27, 1931, testified that he found a pulse rate of 88 sitting and 112 standing, blood pressure 120–78; that the pulse rate indicated some weakness of the heart muscle, but that in his opinion there was nothing to prevent his doing his work as a cook or waiter; that the heart was not normal and should not be treated by overexertion; that the only treatment for the condition he found was rest.

The effect of these conflicts of opinion of the expert witnesses was for the consideration of the jury. The facts observed and testified to by the government's witnesses were inconsistent with the facts stated by and relied upon by the veteran's expert witnesses as a basis for their opinion that he was totally and permanently incapacitated before May 1, 1919. Whether or not they would have altered their opinion if their attention had been called to the facts found by the government's witnesses during the very period covered by their own observations we have no means of determining. Certainly if Dr. Hanley's testimony as to the veteran's incapacity for work was based upon the fact that the veteran's pulse was never less than 100 and was at all times running from 100 to 120, the fact that he showed a normal pulse in 1924, 1926, and 1927 would destroy the basis he gave for his opinion. We cannot, however, say that the government's evidence wholly destroys the value and weight of the evidence of Dr. Hanley, or of the two other expert witnesses for two reasons: First, because its credibility is a question for the jury; and, second, it is not clear that the facts disclosed by the examinations made by the government's witnesses would have changed the conclusions or opinion of Dr. Hanley, or the other witnesses, if called to their attention. Where an expert states his opinion to the jury, it should clearly appear in the evidence, either by the statement of facts, in a hypothetical question addressed to him, or by the witness' statement of the facts, known and observed by him or

stated to him upon what facts he bases his opinion. See Raub v. Carpenter, 187 U. S. 159, 23 S. Ct. 72, 47 L. Ed. 119; Jones Commentaries on Evidence (2d Ed.) §§ 1333, 1334, pp. 2440, 2441, also §§ 1330–1332. Where the parties permit an expert to state his opinion in general terms as to the incapacity of a person to work without injury to his health, it is very rarely that an appellate court would be justified in holding that the conclusion thus adduced is of no substance and so baseless as to afford no support for a verdict. We do not wish to be understood as criticising the somewhat friendly and informal way in which some of these veterans' cases are tried, but it should be realized that this friendly method of submitting general statements and opinions of medical experts to a jury leaves little, if anything, for the consideration of an appellate court. We may suspect that the medical witnesses have exaggerated the amount of incapacity of the veteran and even have exaggerated his symptoms, or have been overfriendly in assuming that labor would impair his health more than idleness would, but we cannot base our decision upon conclusions and considerations wholly within the province of a jury as triers of the facts. The weight of the opinion evidence is for the jury. See Jones Commentaries on Evidence (2d Ed.) § 1375, p. 2515; Congress & E. Spring Co. v. Edgar, 99 U. S. 645, 25 L. Ed. 487; Note 42 L. R. A. 753, 764–g. If we are to disregard positive and definite opinion evidence competent and relevant to the issues, it must be because the factual foundation has not been laid for it on direct examination or has been destroyed on cross-examination, or by rebuttal evidence. Consequently, where the factual foundation for the expert's conclusion is not fully disclosed, it cannot be assailed on appeal if accepted by the jury as sufficient in weight and credibility to support its verdict.

The appellant assigns as error the propounding of a question by the court to an expert witness. No objection was made at the time. The question directed the attention of the witness to the fact that the employment of the veteran continuously at a substantially gainful occupation may have seriously impaired the health of the veteran. This was the sole issue in the case. The question asked by the court was proper.

Judgment affirmed.