## UNITED STATES v. BURLEYSON.
### No. 7023.

Circuit Court of Appeals, Ninth Circuit.
April 24, 1933.

See, also, (C. C. A.) 44 F.(2d) 502.

I. M. Peckham, U. S. Atty., and A. C. Wollenberg, Asst. U. S. Atty., both of San Francisco, Cal.

John L. McNab and S. C. Wright, both of San Francisco, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

WILBUR, Circuit Judge.

Appellant enlisted in the United States Marine Corps in 1918. He was discharged July 10, 1919, as a result of a medical survey because of physical disability. At the time of his discharge he was suffering from flat feet, which incapacitated him for service in the Marine Corps. He continued to pay the premium on his war risk insurance and it was in effect until March 1, 1920. The jury was justified in finding, upon conflicting evidence, that at the time of his trial he was suffering from an incurable, progressive disease known as "thrombo angiitis obliterans," also known as "Buerger's disease," which rendered him totally and permanently disabled. The question is whether there was substantial evidence that this disease antedated the expiration of his war risk insurance, and if so, whether, notwithstanding the fact that he did work for considerable periods of time thereafter for a substantial wage, nevertheless he was totally and permanently disabled because of the fact that such labor impaired or tended to impair his health. The veteran testified that while he did work at a substantially gainful employment for considerable periods after his policy of war risk insurance lapsed, that he suffered intense pain as result of his work, and he never felt able to work, notwithstanding the fact that he did so. He testified that after an operation for appendicitis in February, 1919, performed at the Naval Hospital in Honolulu, and after the removal of his tonsils, he was sent back to the barracks on "light" duty and a few days later ordered returned to "heavy" duty; that after he commenced drilling he had "a terrible pain in my legs from my knee down into the calf of my leg, in both legs. It was a terrible pain, went into my feet and my arches fell and began to swell up. The arches crushed down. Prior to that time there had been a normal arch in my feet. The sole of my foot started to turn red. They were flat and broken down." He testified that thereafter he was sent to the Pearl Harbor Naval Hospital, where he remained about six weeks; that he was then surveyed medically and ordered discharged; that when he was returned to Mare Island, Cal., his feet and legs turned a reddish color up to the ankle, and were very painful; that when he enlisted he was in good health, that he did not suffer from fallen arches or flat feet and was unconscious of any physical defect, but that at the time of his discharge he "was afflicted as I am now. It has developed since that time until now I cannot get around very much. It is worse now."

Dr. Eidenmuller, testifying on behalf of the veteran, stated that he first met him in 1927, and since that has had him under observation. He testified that the veteran was suffering from the above-mentioned disease and described the nature and character of the disease. Briefly stated, it is a disease of the arteries of the lower limbs in which their capacity to carry blood is progressively diminished by the thickening of the walls of the blood vessels. Ultimately the arteries may be wholly obliterated, preventing a blood

supply to the feet and lower limbs resulting in gangrene of the limbs affected, and requiring amputation in order to save the life of the person so afflicted. It is a comparatively rare disease, the cause is unknown, and there is no known cure for it. The treatment is palliative. Apparently the most effective treatment is the artificial stimulation of circulation by change of position of the limbs and by hydrotherapy. Dr. Eidenmuller, a medical expert called as a witness by the veteran, testified that in his opinion the progress of the disease indicated that at the time of trial the veteran had suffered from it for about twelve years, which would be from about one month before the policy expired. He testified, further, basing his testimony upon the symptoms he had observed and from the previous symptoms and history of the case as related to him by the veteran, that in his opinion the veteran was afflicted with the disease while he was still in the service of the United States, and that under the definition of permanent and total disability as stated in the law relating to veterans, the veteran was permanently and totally disabled during the time he was in the Naval forces of the United States and up to the time of trial, and that he would continue to be totally and permanently disabled. On cross-examination it developed that this opinion was predicated in part upon the belief of the witness that it was not for the best interests of his limbs or his life that he should engage in any gainful employment. The witness stated: "I do not believe that he wouldn't be in the condition that he is today if he had not worked, but I believe that he was running a risk of jeopardizing his limbs and his life by work at any time."

He reiterated that while he could not say that if the veteran had not worked he would be in any different shape than he was at the time of trial, that "he was taking a risk that would not be advisable and no medical advisor should have advised him to work since his discharge." On cross-examination he detailed the history given him by the veteran which was substantially in accordance with the testimony of the veteran adduced in court. His conclusion that the veteran was suffering from the above-mentioned disease at the time of his discharge was based upon the veteran's testimony concerning the condition of the arches of his feet and his ankles, etc., as hereinbefore stated. The witness further testified: "I believe he became disabled at that time. Now, I take it that those symptoms so far as we are able to tell in this case, were the beginning symptoms and signs

of this thrombo angiitis obliterans." He testified that from his knowledge of the case he believed that the disease was sufficiently advanced in 1920 so that he was then totally physically disabled.

Lieutenant Frederick C. Kelly, of the United States Army Medical Corps, attached to the Letterman General Hospital in San Francisco, first examined the veteran January 7, 1932. His testimony, on behalf of the veteran, as to the nature and character of the disease, is in accord with that of Dr. Eidenmuller. In response to a question by the court on direct examination he testified as follows:

"The Court. Q. From the statement made by plaintiff, if you accept his statement to be true, do you feel that he was totally and permanently disabled at the time of his discharge from the service? A. I believe he was, yes, sir."

He confirmed this opinion in response to a further question by the court during the cross-examination:

"The Court. Well, doctor, the circumstance is this, I presume, that you feel that if he has stated correctly to you his condition and as to the time, that he was unfit to follow any employment; you don't say he couldn't have done the work indicated, but you think in doing so he was impairing his health; in other words, a man might have consumption and still continue at a task, although in doing the work he is shortening his life, is that your idea? He was hurting himself when he did that work? A. Yes, sir."

On further cross-examination, in answer to some of the questions of the government, this witness indicated that while he knew nothing about the conditions of the veteran in 1918–1919, if he supplemented his own knowledge by the testimony of the veteran as to his condition during those years and subsequent thereto, he was clearly of the opinion that the veteran was totally and permanently disabled at the time he was discharged. The trial judge questioned the witness as follows:

"Q. And in this case, if you accept the history as given on the witness stand as true, if that history is true, in connection with your own observation, do you feel that he was permanently and totally disabled at the time he was discharged; you do, don't you? A. Yes, sir."

On further cross-examination the witness stated: "In my opinion, based on an assumption that the symptoms were Buerger's disease, I would say that a man is not perma-

nently and totally disabled from the inception of the disease. I don't know when the inception of Mr. Burleyson's disease occurred. I have no data to go on as to whether or not Mr. Burleyson had the disease prior to the time he went into the service."

The evidence of both these witnesses for the veteran was given before the testimony of the government was introduced; consequently the above question asked by the trial judge did not include such testimony in the history given on the witness stand.

Dr. Ragle, testifying for the government, stated that he examined the veteran in July, 1919, for the purpose of determining his fitness as a civil service employee in the Navy Yard in Mare Island, where the veteran was subsequently employed. He made a note of his physical condition, including a moderate amount of flat feet; he expressed the opinion that at that time the veteran was not totally and permanently disabled.

Dr. McChesney, testifying for the government, examined the veteran March 7, 1928, October 5, 1928, and February 28, 1929. He found that the veteran had trouble with his feet, but found that the blood vessels in his feet at that time were normal. He testified that in his opinion the veteran at that time was not totally and permanently disabled. He did not, however, determine at that time that the veteran was suffering from Buerger's disease.

Dr. P. A. Magin, an examining physician of the Southern Pacific Railway Company, examined the veteran on July 6, 1926, to determine his fitness for employment by that company and expressed the opinion at that time the veteran was not totally and permanently disabled. He testified, however, that he did not examine the veteran's feet. The veteran testified also that in all physical examinations of him made to ascertain his fitness for employment he purposely refrained from calling the attention of the examining physician to the condition of his feet because of his belief that he would be rejected if their condition were known.

Dr. George R. Carson examined the veteran August 23, 1920, to determine his physical fitness for a position of cashier for which he was applying. He stated that the veteran, in answer to a question as to whether he was suffering from any present form of disability to hands, arms, feet, or legs, answered, "No," and that he accepted the veteran as fit for the position of cashier for which he had applied.

Dr. Guy Wallace examined the veteran on July 20, 1926, and found a condition of the feet which he diagnosed as fallen arches and chronic eczema. His written report was received in evidence.

Dr. E. A. Hobby, testifying for the government, stated he first examined the veteran in 1926 and diagnosed his condition as flat feet. He testified that in his opinion the veteran was not at that time permanently and totally disabled. He found that his feet were congenitally broad and flat and somewhat pronated; he discovered circulatory disturbance in the feet and was unable at that time to determine the cause, but felt it was due to the fact that the veteran's feet had been bandaged a good deal. This witness testified that he was satisfied at the time he made the two or three examinations of him that he was not a victim of Buerger's disease. He testified that he had seen twenty or thirty cases of Buerger's disease, and said: "I cannot name a single case in my entire experience where any victim of that disease improved, or was cured while continuing physical or other labor, nor any other way. I do not think it would make any difference if a man with thrombus angiitis obliterans went out here and worked with a pick and shovel."

Dr. Eleosser examined the veteran on October 19, 1928, and found no objective symptoms of the disease. In his opinion the veteran was not totally and permanently disabled at that time. He testified that none of the characteristic symptoms of thrombo angiitis obliterans were present, so that the subjective complaints, although they might give rise to suspicions, were not in his mind enough to allow one to make the statement as to whether he had the disease or not. He testified that if he had suffered from the disease for ten years at the time he examined him "he would have shown definite objective evidence of his suffering from the disease."

Dr. Hart, attached to the United States Veterans' Bureau as a physician, testified that he examined the veteran on February 27, 1928. He made a record of his symptoms at that time and his findings concerning his physical condition, including the condition of his feet. He did not attempt to diagnose the trouble with his feet and expressed doubt as to his ability to diagnose a case of thrombo angiitis obliterans.

It will be observed from the foregoing that Dr. Kelly, called by the veteran, did not see him until 1932, about twelve years after his policy lapsed, and that he predicated his opinion as to total and permanent disability before March, 1920, upon the statement by the veteran of his symptoms before

his discharge and the veteran's testimony as to his condition over the period of twelve years before he was examined by the witness. In view of the fact that this disease is a progressive one and that its first onset, according to the testimony of the physicians, does not completely incapacitate the victim from work, this evidence of Dr. Kelly is rather unsatisfactory, as may be illustrated by the following questions and answers:

"Q. And would you now express your opinion that he was permanently and totally disabled in July of 1919. A. I couldn't tell you that.

"Q. Would you say that he was totally and permanently disabled in February of 1920? A. I would not be any more familiar with the facts in 1918 than in 1920."

Dr. Kelly also testified it would not be possible to diagnose the disease without a test of the pulse; that the diminution or absence of pulsation of the blood vessels of the feet is a very important thing in the diagnosis of the disease.

Dr. Eidenmuller, who first examined the veteran in 1927, testified: "I have never been able at one time to feel more than one pulse in either leg, in all the examinations I have made of him since 1927, and in my more recent examinations I have not been able to feel any pulse in the left leg and very poor pulse in the right leg just below the ankle."

The results of these medical examinations by the government's witnesses were not called to the attention of the medical experts who testified for the plaintiff who based their testimony as to the history of the veteran's physical trouble entirely upon the testimony of the veteran himself. Consequently, it was not ascertained from them whether or not the results of these medical examinations if truly reported would have affected or changed their opinion as to the degree of the veteran's physical incapacity. The nearest approach to that is this question and answer given on the cross-examination of Dr. Kelly:

"Q. If it was shown in October of 1928 from an examination of Doctors George J. McChesney and Dr. Leo Eloesser, that upon examination of this man they found a pulse in his feet, and their report stated that there was no diminution of the pulse, you would still be of your opinion that thrombo angiitis obliterans existed in 1918 and 1919, at the time of his discharge? A. It was not my contention it existed. I said it was possible, perfectly possible for it to exist."

Thereupon the witness was reminded that he had testified in response to a question asked by the court that in his opinion the veteran was totally and permanently disabled at the time of his discharge, and testified as follows:

"Q. You said the man was totally and permanently disabled at that time?

"The Court. No, the point is this. He is taking into consideration what the plaintiff says. If you remember the statement of someone else, that is only a statement."

Whereupon the following colloquy occurred:

By the Government's attorney: "Q. Doctor, you stated in your opinion that the man was totally and permanently disabled in 1918, or 1919, at the time of his discharge from the Marine Corps? A. I don't know whether I testified that he was permanently disabled in 1918.

"Q. Well, I don't know whether you did in 1918, but you did at the time of his discharge, which is my recollection of that, and the time of his discharge was July, 1919.

"The Court. He so testified, but he said he would have to take the statement of the plaintiff as to the facts as given on the witness stand.

"Q. (by the Government's attorney). Did you express your opinion that he was permanently and totally disabled at that time, did you? A. Yes.

"Q. And would you now express your opinion that he was permanently and totally disabled in July of 1919? A. I couldn't tell you that."

Again the court intervened and the doctor renewed his statement, basing his opinion on the veteran's testimony and upon his own observations that he was permanently and totally disabled before his discharge.

In view of the fact that the veteran's testimony as to his exact symptoms prior to his discharge is based wholly upon his recollection as to symptoms which, if his memory is accurate, evidently made no impression upon the physicians who examined him at the time of his discharge and the fact that he does not testify with reference to the pulse in his feet, knowledge of which Dr. Kelly testifies is essential to a correct diagnosis, the opinion of Dr. Kelly, based as it is upon the veteran's testimony, is a very unsatisfactory basis for a judgment. As far as the record before us shows no effort was made by the government to call the attention of Dr. Eidenmuller to the facts upon which the government relied to counteract the evidence offered in behalf of the veteran.

The unsatisfactory condition of the record is emphasized by the fact that the veteran did work for long periods of time at substantial wages, nor do we think that the period during which he abstained from work because of the pain was sufficiently great to justify the conclusion that he was not continuously employed. We quote the work record of the veteran as correctly stated in appellant's brief:

"Started work at Mare Island, California, July 17, 1919, and worked continuously without interruption until August 19, 1920, at a wage scale of $4.24 per day until December, 1919, and from that time until August, 1920, $3.84 per day.

"On August 25, 1920, less than one week after leaving his employment at Mare Island, he was employed by the Southern Pacific Railroad in the dining-car service at Tracy, California, at $105. per month and found, for two weeks, and then transferred to Yuma, Arizona, at a wage of $115. per month and room, where he remained for nine months. This was in June of 1921.

"He was then employed at the Hotel Merritt, Oakland, as a room clerk for two months at $75. per month and found.

"His next employment was at the Hotel Del Monte in April of 1922 as a store clerk for two months at $70. per month and found.

"In July of 1922 he returned to the Southern Pacific Railroad Company, the dining-car service, working three months at Tracy, California, and four months, until April, 1923, at Imlay, Nevada, at a wage of $90. and found, and then at Bowie, Arizona, and Indio, California, at a wage of $90. a month and found. He then resigned from the Southern Pacific Railroad Company on September 2, 1923.

"On September 21, 1923, he was employed by the Emporium Department Store, San Francisco, where he worked continuously until May 16, 1924, at $80. per month. During this period he attended Heald's Business College in San Francisco at night.

"His next employment, as shown by the evidence adduced at the trial, was at the Fox Hotel, Taft, California, as a room clerk, commencing on January 1, 1925, and continuing until June 1, 1926, for a period of eighteen months at $125. per month.

"Upon leaving the Fox Hotel he was employed at Tahoe Tavern on Lake Tahoe for a period of three months as a room clerk from June, 1926, to September 30, 1926, at $125. per month and found. At this time the Tahoe Tavern closed for the season and he was employed at the Whitcomb Hotel in San Francisco as a relief clerk for approximately two months at a wage of $90. per month and meals.

"Upon leaving the Whitcomb Hotel, appellee was employed for a period of two months at the Granada Hotel, San Francisco, at a wage of $75. per month and found. On April 3, 1927, he entered the employ of the Worth Hotel in San Francisco, and continued there as a room clerk at a wage of $125. per month until August 15, 1928."

◼◼ Having thus been employed continuously immediately after his discharge and also after the lapse of the war risk insurance policy at substantial wages, the medical testimony on his behalf dwindles to the opinion that he was unable to work because it impaired, or tended to impair, his health, and this opinion in turn is based upon the conclusion which is based upon the veteran's testimony as to his symptoms that he was suffering from the disease, thrombo angiitis obliterans, at the time of his discharge. On this diagnosis the experts disagree, nor is it entirely clear from their testimony that it was detrimental to the veteran's health to work as he did in the event that he was suffering from Buerger's disease. However, the weight of this evidence was for the jury. Their verdict is to the effect that for the veteran to work continuously would impair his health. In view of this situation, no matter how unsatisfactory the condition of the record, we must hold that there was substantial evidence to go to the jury upon the question of the total and permanent disability of the veteran before the lapse of his war risk insurance policy. The case is somewhat similar to United States v. Francis, 64 F.(2d) 865, this day decided by this court.

Judgment affirmed.