**38**

## UNITED STATES v. SMITH.
### ·No. 82.

Circuit Court of Appeals, Second Circuit.

Dec. 11, 1933.

Howard W. Ameli, U. S. Atty., and Herbert H. Kellogg and Albert D. Smith, Asst. U. S. Attys., all of Brooklyn, N. Y., Davis G. Arnold and C. L. Dawson, Attys. Veterans' Administration, both of Washington, D. C., and Joseph H. San, Atty. Veterans' Administration, of New York City, for the United States.

Milton Seymour Cohn, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

Appellee enlisted in the military service, United States Navy, April 9, 1917, and was honorably discharged January 15, 1919. He obtained and had in force a $5,000 war risk insurance contract payable in the event of becoming permanently and totally disabled while the insurance was in force.

The question involved below was whether the appellee became permanently and totally disabled prior to April 1, 1919. The jury found that he was permanently and totally disabled on February 1, 1919.

Appellee worked, in the service, as a coal passer and fireman, and in the motor service, doing repair work about engines. He said that in January, 1918, his feet got very cold and tingled and seemed to be numb and he suffered pain. Thereafter he could not stand the cold weather, and his superior officer transferred him to the evaporator room, where he remained until the end of his service. In January, 1918, a lifeboat dropped on his feet, which caused lameness for a few days. At one time, in 1918, while in France, he was acting as pallbearer for one of the men on board ship who had died, and he marched about five miles and was unable to walk back because of pain in his feet. He suffered from inflammation of his right foot at times; at other times it was chalky white. Near the end of 1918 he developed what he regarded as a hang nail on the large toe of his right foot. His foot was inflamed. At times he was unable to stand.

Within three days after his discharge, he secured employment on a municipal ferry of the city of New York. But he still had a sore on his foot and suffered pain. However, he worked eight hours a day seven days a week. His feet were sensitive to cold, but he continued to work until August, 1922, and then he stopped working until March, 1923. All this time he was under the care of a doctor. In 1923 he worked as a laborer for a contractor on Long Island and remained in that employ until April, 1924. In October, 1923, and in 1924 he had operations on the small toe of his right foot. His feet were inflamed at this time, and he walked with difficulty,

and they became progressively worse. The small toe of his right foot had rotted off, and in June, 1925, another operation was necessary. In 1931, his right leg was amputated below the knee, and later his left leg was amputated. He was in the hospital for five months.

While working for the municipal ferry service, he received full pay and also the prevailing rate of wages paid as a laborer while employed by the contractor. The physician who examined the appellee in February or April, 1924, made a diagnosis of osteomyelitis of the bone of the toe. He considered this the result of a frost bite. Later hospital records introduced as evidence show the plaintiff to have been admitted to an institution in April, 1929, and discharged in May, 1929. The diagnosis was gangrene of the great toe of the left foot. An examination in February, 1931, revealed that he was suffering from endarteritis obliterans of the left great toe. An expert testified in answer to a hypothetical question that the appellee was suffering from thromboangiitis obliterans of a progressive type. He was not permitted to answer whether or not the appellee was permanently and totally disabled in February, 1919. This disease causes a stoppage of the circulation, and the flesh and bone are caused to rot and fall away. It is this that led to the amputation of the legs, and, it is said, may necessitate the amputation of both arms. This rare disease, commonly known as Buerger's disease, is named after a physician who won a reputation in its study and treatment.

■ This court has had occasion recently to consider liability under the war risk contracts. United States v. Wilfore (C. C. A.) 66 F. (2d) 255; Wilks v. United States (C. C. A.) 65 F.(2d) 775; United States v. Clapp (C. C. A.) 63 F.(2d) 793, 795; Mason v. United States (C. C. A.) 63 F.(2d) 791; United States v. Lumbra (C. C. A.) 63 F.(2d) 796. In United States v. Clapp, supra, speaking of permanent disability, we said:

"The proper test, we think, is this. The insured can recover only by showing that at the lapse he was suffering from some ailment, of which it is possible to say with reasonable certainty that it was incurable at that time, or with equal certainty that it must lead to another and incurable ailment. * * *

"We hold that the only use to be made of information which becomes available between the lapse and the trial, is to discover what was the actual pathological condition of the insured at the lapse; the prognosis, once that is discovered, is to be made as of the lapse and without regard to what in fact followed."

We there pointed out that the question of fact, whether the known symptoms at the time the policy lapsed disclosed permanent disability, must be answered by expert medical testimony and not left to the unguided intuitions of the jury.

■ In Wilks v. United States, 65 F.(2d) 775, 776, which turned upon totality of disability, we said:

"The regulations have defined total disability as 'any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation.' By 'continuously' is meant with reasonable regularity. * * * He was able to work as a bookkeeper at least until January 31, 1922. So far as appears, he lost no time whatever; that is, he pursued this work with reasonable regularity. Such work was not dangerous to his health and did not accelerate the progress of the disease."

■ From the record it appears that the appellee for three years after the lapse continued in gainful occupation. Indeed, it was possible for him to work up to 1922 after which he was obliged to go to the hospital for treatment, and from then on was treated until the resulting amputations. The test is not what the appellee actually did or what one might be reasonably expected to do when in need of means for a livelihood. But the test is whether the insured was able to work and did work after the lapse of the policy without impairment to his health. If he did so at peril to his health, he may still be regarded as permanently and totally disabled. The test is what a man would do looking to preserve his health, and if a man stricken would lie off completely and not work at all thereafter, he would be regarded as totally and permanently injured. There is no medical testimony showing that the work he performed was detrimental to his health or recovery, and no jury question was presented. The record as it now stands fails to show that the appellee had a total or permanent disability prior to the time his insurance contract lapsed. Even though continuously employed since his discharge, medical testimony, if available, might show that he was unable to work because it impaired or tended to impair his health. It might show that suffering from Buerger's disease it impaired his health to work. This, if proved, would justify a jury in concluding that he was totally and permanently disabled before the lapse of appel-

lee's war risk insurance. See United States v. Francis, 64 F.(2d) 865 (C. C. A. 9); United States v. Burleyson, 64 F.(2d) 868 (C. C. A. 9).

This judgment will be reversed, and the cause remanded for a new trial.

Judgment reversed.