## UNITED STATES v. BAKER.
### No. 7389.

Circuit Court of Appeals, Ninth Circuit.

Nov. 13, 1934.

J. A. Carver, U. S. Atty., E. H. Casterlin, and Frank Griffin, Asst. U. S. Attys., and R. L. Slaughter, Atty., Department of Justice, all of Boise, Idaho, and Wilbur C. Pickett, Sp. Asst. to the Atty. Gen.

B. W. Oppenheim, J. M. Lampert, and J. B. Musser, all of Boise, Idaho, for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from a judgment in favor of the veteran upon a war risk insurance policy based upon the claim that the insured became totally and permanently disabled before the policy lapsed on May 31, 1919.

The government appeals, assigning as error the refusal of the court to grant the motion for directed verdict made at the close of the evidence and assigning as error certain instructions to the jury given by the court in response to questions asked by a juror. At the conclusion of the instructions the court stated: "The record may show exceptions to both plaintiff and defendant to the instructions given." No objection was made by either party to the instructions, no grounds of objection were stated, and no exceptions taken. The statement by the court that exceptions would be allowed to both parties is an insufficient basis for an assignment of error.

Two medical witnesses were introduced by the plaintiff. Each testified in response to a hypothetical question that in his opinion the veteran was totally and permanently disabled at the time he was discharged from the Army and before the policy of insurance lapsed under the departmental definition which was included in the question.

The veteran was wounded in the Argonne in October, 1918, by shrapnel, a fragment of which was imbedded in his hip. The piece of shrapnel is in the pelvic bone about 2¼ inches from the hip and 3¼ inches from the sacroiliac joint. The shrapnel has become encysted. At the time of his discharge the veteran stated in writing that he had no reason to believe he was suffering from the effects of any wound or from any impairment of health. On February 10, 1922, the veteran wrote to the Bureau as follows: "That my physical condition since discharge has been good except have been troubled a great deal with the shrapnel wound in left hip and have been troubled with rheumatism in same. That my present physical condition is sometimes the leg gives way entirely and I fall to the ground. This may come on at any minute. The leg is weak."

In 1922 the veteran declined vocational training, and gave as his reason that he was engaged in stock raising and had cattle and was too busy and did not have time.

On October 14, 1925, he applied for life insurance in the Bankers' Reserve Life Insurance Company of Omaha, Neb. He gave his occupation as a stockman, stated he had been engaged in that occupation for five years, and that as far as he knew he was in good health, that he had been wounded in the left hip, and claimed that a piece of shrapnel was still imbedded in the bone.

On March 20, 1926, the veteran wrote to the United States Veterans' Bureau with reference to the subject of compensation based upon his service wound, stating: "I think you have all the evidence that is necessary and this evidence shows that I am disabled not less than forty per cent. * * * Now, with this evidence I feel like I was entitled to not less than forty per cent disability."

When the veteran applied for additional life insurance in 1927 he again stated he was in good health, and, in response to the inquiry of the company as to whether or not he had or ever had had any disease or injury, he answered as follows: "Wounded in left hip during last war by piece of shrapnel. Operated upon in Base Hospital 90, Chaumont, France, complete recovery." At the time he entered military service he was engaged in farming and stock raising. He returned to his homestead of 160 acres after his discharge from the Army and continued in that occupation. The veteran testified in that regard as follows:

"On the farm I chored around, such as milk a cow or two, and maybe feeding a few hogs. I did not have hired help. My brothers helped without hiring them. I did not have any other assistance. My father operated the ranch where I went about two months after I came back. I resided there until just before I was married, [July 20, 1920] and then my wife and I rented a place adjoining that. We stayed there approximately eight years. It was a stock ranch. I did odd jobs that could be done on the ranch with-

out too much exertion and without heavy lifting or anything like that. * * *

"We had between sixty and seventy head of range cattle and others. I did not always feed them myself because I didn't feel as though I had sufficient strength to do that work during that time. My brothers and my wife and my father fed them when I did not. My wife and my father and brothers helped me about cutting and putting up the wood. I did not work all day at putting up the wood and when not working I would generally go to the house and lay down on the lounge for maybe a half an hour and maybe an hour. When not at work I had pain in my left hip, it was drawing all the time. * * *

"From that place we moved to just a small irrigated farm of about seven or eight acres where we stayed about two years. I did not do all of the work on that farm. My wife helped me. My wife done the chores, such as irrigating, helped milk the cows and helped get the wood. While she was doing that I was at the house most of the time resting. Then I had pain in the back and hip mostly; also I was bothered with such as coughing and trouble with breathing. That was always true when I was inside and outside. * * *

"I had a homestead at the time of my return from the service. When I first returned I went to my father's place, not to the homestead because it wasn't improved. Later on I improved the homestead and went on it to live and in addition to the homestead I operated another place that joined it. The highest number of cattle I operated was seventy and from that down to seven or eight. The last five or six years I ran seven or eight head of cattle. I might have had a few head more in 1928 and 1929 because I bought twenty head of beef steers during that time and held them in the summer. I carried them for about eight months. * * *

"During the time of my operations from my return from the service until 1923, I exchanged work with my neighbors mostly. I did not employ anyone at that time to work for me."

Dr. Germon testified that the shrapnel was 2¼ inches from the sacroiliac joint, the joint was normal, there was no injury to it; the metal was 3½ inches from the hip joint; that both hips were alike, there was no injury at the head of the femur, and that the foreign body was not in proximity to the joints or important nerves of the body; that the X-ray plates showed no arthritic changes,

and that the plates did not indicate that the plaintiff was suffering from arthritis; that the veteran was able to go through the ordinary motions of the human being; there was no limitation of the movements of the spine.

Dr. Foster, a specialist in nerves and mental diseases, testified as to his physical condition and the effect of the injury; stated that in riding for a long time the veteran would suffer discomfort. He also testified that there was no injury to the major nerve trunks.

Dr. Trauba, testifying for the government, specializing in internal medicine, found no evidence of active bronchitis; that the patient was able to move his head within the normal range; that he found nothing wrong with the spine; that he has a postural curvature, but no atrophy of the legs or thigh. He testified that the veteran may have had bronchitis in the past, but "now he does not have anything to warrant treatment."

Dr. Schilling, who examined the veteran at the time of his application for insurance in the Bankers' Reserve Life in 1925 and later in 1927, found nothing in the physical condition of the veteran affecting the risk except the shell wound in his hip, which, he testified the veteran stated to him, did not bother him at all.

Dr. Morse, testifying for the government, stated he examined the plaintiff November 15, 1923. He found nothing wrong with him except the gunshot wound, chronic tonsilitis, and bad teeth. He further testified as follows:

"He told me his prior occupation was farmer. He stated that since discharge he had been farming for himself. I am familiar with the general day-to-day duties of a farmer.

"A. The man stated at the time of the examination that he had been farming for himself since discharge; this period covered four years and a half. He claimed that the left hip was somewhat weak and, at times, painful and tired easily, especially when walking over rough ground, but my examination would not indicate he was suffering from a condition that would seriously handicap him in that occupation. I believe at the time of the examination that this man was in a measure, handicapped for the full duties of a farmer. I mean that he would probably not be able to work from sunup to sundown, without resting or easing his hip, but in general, I considered he was able to do most of the farmer's duties."

It is apparent that the veteran was engaged in an occupation continuously for a period of nearly ten years. The evidence seems to indicate that it was a substantially gainful occupation. Under the circumstances, the burden was upon the veteran to establish that the occupation he followed was not substantially gainful, if that was the fact. There was nothing in the testimony of the corroborating witnesses which tended to emphasize the disability of the veteran beyond his own statement in that regard. We quote a few excerpts from the testimony. Witness Earl Sewell testified:

"And I saw Mr. Baker attempt to do things like that after he came back. I don't remember but it seems he (plaintiff) was away during the summer of 1919. I saw him riding, roping, all such things, and in continuing this work he complained and finally he couldn't stand it. He couldn't keep up. * * *

"He couldn't run the mowing machine, not too long at a time. He would tire more quickly. He would work at it a day or two. He could pitch hay at times. He harrowed with riding horseback and plowed with a riding plow. For a few days he could do pretty well."

Witness E. W. Butcher testified as follows:

"He had cattle there and joined with the boys and looked after them. We would be riding together and after a half day's riding he would complain of his hip bothering him and when he got off he put his hand on his hip to brace himself to walk. He said his legs were tired. He would walk around his stock corral branding cattle and he tried to help. At times after he worked a few minutes he would have to quit. * * *

"After throwing cattle he would stay with his horse. I have walked the hills with him and at times he would get along all right and at times he complained that it was hard work for him to walk. I noticed that when he walked he had a slight limp which, since the war, has been with him at times I believe. In walking through the hills he did not keep up with me."

Clay Davis testified as follows: "After he came back I saw him trying to work, plowing, riding a gang plow and mowing and raking. He pitched hay for me but he couldn't hold out. I don't know as I know of him mowing more than two days. There isn't more than two days' mowing in that country straight hand. Pitching hay he would be all right for one day and then he couldn't hold up. He would complain of his hip and generally go and lay down. The longest period of time that I was with him when he worked day after day, was seven days. That was at my place harrowing. He did not work every one of those seven days although there was work for him to do. During the working hours he would retire along about three o'clock, from then on."

Roe Baker testified as follows:

"He was short-winded after an effort to walk, to pitch hay or some work such as that. About a week or two after his return I worked with plaintiff at riding. It was hard for him to get on and off a horse. He did not remain on a horse all day, although his work required him to do so. When he got off the horse he would lie down and that would occur quite often. When he got off his horse his leg would give way and he would fall down. He worked with me building fence about four years ago and while at that work he would lay down and rest. The work was to hold the post and stretch the wire. He did not stretch wire all day long but would quit and come in while I did his work for him. That happened quite often. He did not work straight through a full day. I also worked with him at trail maintenance about two years ago for the Forest Department, under Mr. Glover. He did not work all day long but would go and lay down under a tree. This happened sometimes every day and sometimes several days apart. I believe he was on that job something like three months and I was with him all the time. When he was lying down I did his work for him. I was foreman of the outfit and ordinarily I would not have that work to do. Sometimes anyone that happened to be with him would do his work and this happened occasionally. It would be hard to say how frequently but there was a few times. Last year I saw him try to pitch hay at my place. It was a two or three days' job and he would not work through the entire time. During those two or three days he pitched hay some and when not so working he was lying down, resting. That would happen two or three times during the day. After he came back from the war we were together in the cattle business for a couple of years. He slept in my home, sometimes in the bed with me but in the same room. He did not sleep all night through. I could not say how often he woke up. He would moan and groan and sometimes he would holler, just a loud vocal noise. This occurred several times during that period. While in bed he would jump. During our partnership we had ordinary farm work

to do. I did the plowing myself. Plowing was there for him to do and he tried to do it. He would hitch up the horses and start out in the field and would say he couldn't do it because his hip hurt him and I would go out and do it. He was short of breath and when his hip hurt him he would go and lay down. He drove the team while I pitched the hay. We had about two or three days' hay and during haying he would stay at the house about one-third of the time. I have had occasion to walk with him for a mile or a half a mile and he would not keep up with me. In walking he would limp. * * *

"Plaintiff received full compensation for his work but when he lost a half day I would dock him for that. I was the foreman."

To state in detail all the evidence for and against the plaintiff would require that we quote almost 100 pages of the transcript. To do this would unduly extend the opinion. There is a dispute as to the actual physical condition of the veteran, the doctors disagreeing as to the evidence of bronchitis, ankylosis, as to the partial dislocation of the spine, and perhaps as to other physical conditions. The jury accepted the testimony most favorable to the veteran, and we are bound by that decision, but there is no dispute in the evidence that for a number of years, at least eight or ten, the veteran actually carried on a gainful occupation and that his work was reasonably continuous. The veteran's contention was that he could not work continuously by reason of the pain and lameness resulting from his wound and by reason of a bronchial condition due to being gassed while in the service. He could not work as long each day as he otherwise would in order to perform the work which was available, for he had to rest frequently and could work relatively short hours. As stated by the Supreme Court in Lumbra v. U. S., 290 U. S. 551, 559, 54 S. Ct. 272, 276, 78 L. Ed. 492: "The above-quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed. If read literally, every impairment from time to time compelling interruption of gainful occupation for any period, however brief, would be total disability."

As stated by the Circuit Court of Appeals for the Second Circuit in Wilks v. U. S., 65 F.(2d) 775, 776, the word "continuously," as used in the above-mentioned rule, means "with reasonable regularity." See, also, U. S. v. Smith, 68 F.(2d) 38, by the same court.

If the veteran by working less number of hours than is usually required of workmen was able to work continuously, that is, with reasonable regularity or continuity, and by such work gain a reasonably substantial income, he was not totally and permanently disabled within the meaning of the war risk insurance policy.

The testimony of the appellee's witnesses that he was totally and permanently disabled is entitled to no weight, because it was based upon conflicting testimony and upon the departmental definition of total and permanent disability (see United States v. Stephens [C. C. A.] 73 F.(2d) 695, United States v. Young (C. C. A.) 73 F.(2d) 690), and invades the province of the jury. The opinion evidence was adduced without objection, and hence we add that the appellee's work record alone would require us to ignore these opinions, for we hold that as a matter of law the appellee's work record establishes that he was not totally disabled.

The government also relies upon assignments of error with relation to instructions given by the trial court. As we have pointed out, these assignments were not predicated upon proper objections or exceptions, and cannot be considered.

Judgment reversed.